Daniels, J.
This action has been prosecuted to set aside and annul a deed executed by Bichard Hughes under the name of David Jones to the defendant Joseph Jones, because of the mental incapacity of the grantor.
The deed was executed on the seventh of October, 1870, and recorded on the second day of the succeeding month. It in terms conveyed the property called Buckhorn Island, situated near the foot of Grand Island in Niagara Biver.
It has been owned and occupied by the grantor from the year 1853. The grantee in the deed is a son of the grantor by a second marriage alleged to have been, as it probably was, unlawfully contracted.
The plaintiff is a son by a preceding marriage and entitled to inherit his property in case the deed should be set aside.
For the purpose of sustaining it, evidence has been given showing what transpired immediately preceding and at the time of its execution, and by that evidence it has been made to appear that the deed was drawn and executed while the grantee named in it was absent from the State. He had nothing whatsoever to do with the transaction and in no manner influenced the conduct of the grantor in making it. It appears on the contrary that the design to execute and deliver the deed was voluntarily formed by the grantor. He was desirous of having the grantee and his wife occupy the property, and to be taken care of and supported by them during his natural life. For that purpose, and the additional object of securing a like support for the second wife, he induced the grantee in *144 the deed to return to the State of New York, accept the deed and take possession of the property, and after that time he supported and maintained the grantor and his wife during their natural lives.
Before the deed was made, the grantor consulted an acquaintance, with whom he had dealt for years, residing at Niagara Falls, concerning the execution of the deed, and was referred to Mr. Griffith, a reputable attorney of that place, to have the business done. He repaired with the grantor to the office of the attorney, where he made a statement of what he desired to do, and the deed was then drawn and executed. These witnesses agree that in what he said and did upon these occasions, he appeared to act rationally and intelligently, and their statements are corroborated by the interview which the grantor had with the wife of the grantee upon the same subject, and by interviews and transactions which he had, in the way of business, with other persons at the same place and in the vicinity of his residence near the time when this deed was executed. The evidence of all these persons tends very directly to establish the fact that he fully understood the business which was transacted and the object designed to be accomplished by it, as well as the property to be conveyed, and that it was his deliberate purpose to make the disposition of it which he in form made by the execution of this deed.
In the preceding month of March he made a twelve year lease of the same property upon a similar consideration to the plaintiff in this action, and no evidence has been given indicating that the plaintiff regarded his. father as incapable of making and executing such an instrument at the time when it was done.
Under this lease the plaintiff went into possession, but surrendered it afterwards because of a disagreement between himself and his father. This disagreement and the dissatisfaction which his father expressed con *145 ceruing the plaintiff and his conduct toward him, in some measure, no doubt, induced the disposition which was made of the property by the execution of the deed. He considered it better for himself and more agreeable to his wishes and purposes to put the property in the hands of the other son than to leave it where the other might by any possibility acquire title to it.
To meet this evidence, testimony was given in behalf of the plaintiff as well as by himself as a witness in the case, showing that his father, who was a man of very advanced age, was irritable in his disposition, boisterous in his speech, suspicious of those who dealt with him, or were employed by him, in the management of his property, and indulged in the relation of marvelous and exaggerated stories. This appears to have been his character and his habits for many years, preceeding the time when the deed was made, and while no one suspected his sanity or his ability properly to manage his own affairs.
The suspicions entertained by him appear to have arisen from observations he had made, leading him to believe that the persons employed about or managing his property dealt dishonestly with him, and the relations he repeated of marvelous occurrences in which he had been a party, referred to transactions which had taken place in his early life. The statements he made and the suspicions he entertained appear to have been exaggerated and in many instances extremely absurd in their character, but as long as they were founded upon facts from which he was satisfied to deduce them, they were not indications of insanity or unsoundness of mind, although extended very much beyond what was justified by the circumstances.
They were therefore distinguishable from mere delusions, and do not establish that unsoundness of *146 mind which would legally disable him from making a binding disposition of his property (Am. Seaman’s Soc. v. Hoffer, 33 N. Y. 619). While he indulged in these statements and suspicions, he still continued to manage and conduct his own affairs, spid the persons having dealings with him apparently found no reason for suspecting his inability to do that business with accuracy and judgment.
Towards the latter portion of his life, and before or about the time when this .deed was made, he' was impressed with the delusion that British ships laid in the vicinity of the Island, manned by early acquaintances for the purposexof protécting it. But this delusion was in no form or manner connected with the execution and delivery of this deed.
His mind still m other respects and on other subjects, although impaired by age, in its strength, was active and intelligent. Between the delusion and the transactions of his business there seems to have been no connection whatever. Upon other occasions he became violent and vindictive in his conduct, but there was always a ground of offense calculated to produce resentment as well as irritation on his part. His conduct though extreme was not unnatural for a person of his disposition, education and temperament.
He believed in witchraft and the feats which may be accomplished by the power of persons affected with it, but this was rather a matter of supposition than evidence of mental incapacity or delusion. While he was boisterous, vindictive, revengeful, easily provoked and aroused, he still appears to have understood the business transactions to which he was a party and to have managed them with intelligence and judgment. No one of them appears to have been more fully comprehended orthoroughly understood or designed, than the execution of the deed in controversy, and the purpose indicated to be accomplished by making it.
*147 Upon all the evidence elicited from the witnesses in the case who testified upon these subjects, it can not be concluded that he was, by reason of mental infirmity, incapable of making and executing this deed.
•On the contrary, all the evidence connected with it sustains the conclusion that it resulted from intelligent consideration and reflection upon his part, and that it was understandingly made to carry into effect a fixed design which he himself alone had previously formed.
Evidence was given showing that proceedings were taken under the statute in September, 1871, on the application of the grantee in this deed, to procure an adjudication determining his father, the grantor to be a lunatic, or person of unsound mind.
Previous to that time he had been imprisoned in the county jail at the suit of the plaintiff, and evidence has been given tending to indicate that such an imprisonment would aggravate the tendency of his health in the direction of a state of insanity. This theory is entirely natural and could hardly require evidence to present it. For imprisonment of an old man at the instance of his son would ordinarily be attended with some effect on Ms character. While he was in prison and when he was brought before the jury impaneled to inquire into the state of his mental condition, it may therefore be reasonably supposed that it had substantially deteriorated since the execution of the deed.
The fact that his conduct and speech surprised the jurors as well as the jailer, with the conviction that he was a person of unsound at the time, can, for this reason, have no very decided influence upon the inquiry whether that was or was not his condition at the time of the execution of the deed. To determine that, the important evidence is that which related to the con-’ *148 temporaneous occurrances and the previous condition in which this man appeared to have been.
The application upon which the proceedings were instituted and carried on was based upon a petition presented by Joseph H. Jones, the grantee in the deed. In this petition it was alleged David Jones, the grantor, had been a lunatic for the space of five years preceding that time, and “ so far deprived of his reason as to be wholly unfit and unable to govern himself or to manage his own affairs,” and upon the hearing under the authority of the writ which was issued, the jury in form found that to be his condition.
Their finding was that he was at the time of taking the inquisition, a lunatic or person of unsound mind ; that he did not enjoy lucid intervals ; that he was incapable of the government of himself or the management of his lands, tenements, goods and chattels, and that he had been in the same state of lunacy for five or six years.
But neither these allegations, nor the conclusions of the jury, presented the inquiry whether, as a matter of fact, he was competent to execute this deed at the time when it was made. That was not a subject presented for trial by the petition, or the investigation made by the jury. The allegations were general in their character and affected the ability of the person proceeded against to manage and carry on his affairs and business. It was not necessary, in order to sustain the truth of the allegations, to establish or find the fact that isolated matters of business or particular dispositions of property could not intelligently or understandingly have been made by him.
The purpose of the proceeding was to determine whether from his age and imbecility he required the guardianship of a more competent person for the protection of himself and his affairs, and evidence establishing that to be the fact was all that was required' *149 to sustain the proceeding, or justify the conclusion mentioned in the inquisition (Matter of Mason, 1 Barb. 436, 437). Jurisdiction of the court over these inquiries includes cases where the person from old age, sickness or other causes, becomes so weak of mind as to be unable to manage his affairs (Matter of Barker, 2 Johns. Ch. 232). "And the legal prosecution of such an inquiry did not include the question now presented, in this case : whether or not the grantor of this deed was competent to execute it. It was not a matter alleged in the petition, or in any manner drawn in question. No evidence could properly have been given upon it, and it was not the province of the jury to make a determination which would or would not sustain this particular transaction.
Before a party can be concluded by a legal proceeding he must have an opportunity to be heard, when he may produce witnesses and contest the claim made against him. This was not as to this deed a proceeding of that nature, but as before observed it was instituted to ascertain the general mental condition and capacity of the party proceeded against. While it is true that judgments and other legal proceedings will conclude the parties to them, they are still only so concluded by the decision which may have been necessarily made ; as to matters not brought in controversy and not essential to the decision, it is in no manner controlling, even upon the person at whose instance the proceeding may have been set on foot.
The general rule upon this subject is that the judgment or decree of a court is final as to the subject matter thereby actually determined, and to every other matter which the parties might litigate in the cause or which they might have had decided ; and that is the utmost extent of this rule (Embury v. Conner, 3 N. Y. 511, 522 ; Burwell v. Knight, 51 Barb. 267; White v. Coatsworth, 6 N. Y. 137-139 ; Tusca v. O’Brien, 68 Id. *150 446, 447). When the point afterwards presented is not included in the adjudication it is not afterwards controlling in its determination (Campbell v. Consalus, 25 N. Y. 613). And it has accordingly been held that an inquisition of this nature, finding the party to have been of unsound mind for a preceding period of time, is not conclusive as to his incapacity to make a will during that time (Searles v. Harvey, 6 Hun, 658). And a similar view, to that effect, of such a proceeding was taken in (Banker v. Banker, 63 N. Y. 409).
It is not necessary to determine the point so earnestly argued in the case whether this proceeding is included within this rule or not, for it is manifest that neither the allegations made nor the verdict of the jury can be so far lawfully extended as to include the controversy now involved in this action. It is no. appropriate or legitimate part of that proceeding to litigate the question whether this deed was or was not executed by the grantor, when he was incapable of performing such an act, but all that was required in the proceeding, for the purpose of sustaining it as broadly as it. was prosecuted, was to show that the person proceeded against was generally inadequate to.the care and management of his affairs and the support and protection of himself. To that extent the result is conclusive and no further. The determination accordingly cannot overreach or annul the deed executed by the father to this son.
In the petition which was presented, the making of this deed was in no manner, mentioned or referred to, neither were the proprietary circumstances or condition of the person proceeded against set out, but it was stated that he owned this island at the time when he became a lunatic and within the last two years. This allegation as to the ownership was as strictly true, for the petition was sworn to upon the 99th of September, 1871, while the deed was made in October, 1870, about *151 thirteen months previously. There was no untruthful statement made by the petitioner upon this subject, and the deed itself was upon the records, from which accurate knowledge of the transaction might easily have been derived. The jury, however, in the inquisition returned, stated the person proceeded against to be the owner of this island, and that he bad not alienated any of his lands or tenements.
These proceedings are usually loosely carried on, and this statement may very well have been made, as it probably was, from the fact that this island had for many years been the property of the alleged lunatic, and no evidence was given that he had parted with the title. The petition itself required no such finding, and it appears to have been rather an incident, than to have formed any material or necessary portion of the inquiry.
The deed cannot be annulled or set aside by this proceeding, and as the other evidence given upon the trial is sufficient to sustain the competency of the grantor at the time when the deed was made, it necessarily follows that this action cannot be sustained. Judgment will therefore be ordered in favor of the defendants.